UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| THOMAS P. DINAPOLI, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil No. 26-11075-LTS |
| BJ'S WHOLESALE CLUB HOLDINGS, INC., | ) | |
| Defendant. | ) | |

ORDER ON PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF (DOC. NO. 5)
AND DEFENDANT'S MOTION TO DISMISS (DOC. NO. 16)

April 22, 2026

SOROKIN, J.

Thomas P. DiNapoli brings this lawsuit against BJ's Wholesale Club Holdings, Inc. ("BJ's") in his capacity as the Administrator of the New York State and Local Retirement System and Trustee of the New York State Common Retirement Fund ("Fund"). The Fund contends that BJ's violated Section 14(a) of the Securities and Exchange Act of 1934 ("Act of 1934") and the Securities and Exchange Commission's implementing regulation when it declined to include the Fund's shareholder proposal in its 2026 proxy materials.

Pending before the Court are two motions: (1) the Fund's motion for injunctive relief, Doc. No. 5,[1] and (2) BJ's motion to dismiss, Doc. No. 16.  For the reasons that follow, the Court ALLOWS the motion for injunctive relief and DENIES the motion to dismiss.[2]

I.    BACKGROUND

    A.    Statutory and Regulatory Background

"A proxy is a means by which a shareholder authorizes another person to represent her and vote her shares at a shareholders' meeting in accordance with the shareholder's instructions on the proxy card." Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc., 821 F. Supp. 877, 881 (S.D.N.Y. 1993).  "Proxies have become an indispensable part of corporate governance because the '[r]ealities of modern corporate life have all but gutted the myth that shareholders in large publicly held companies personally attend annual meetings.'" Id. (quoting Stroud v. Grace, 606 A.2d 75, 86 (Del. 1992)).  Without a mechanism for proxy voting, "corporations effectively would be unable to elect directors and take other required actions." Id.

A public company that solicits proxies to vote in annual meetings "must distribute a proxy statement to each of its shareholders in advance of the annual shareholder meeting." Trinity Wall St. v. Wal-Mart Stores, Inc., 792 F.3d 323, 334 (3d Cir. 2015).  The proxy statement "is an informational package that tells shareholders about items or initiatives on which [they] are asked to vote, such as proposed bylaw amendments, compensation or pension plans, or the issuance of new securities." Id. (citation modified).

---

[1] Citations to "Doc. No. __" reference items filed on the electronic docket ("ECF") in the action that is the subject of this Order; pincites are to the page numbers in the ECF header or, where applicable, to the paragraph numbering within the document.

[2] The Court appreciates the excellent, candid, and thoughtful arguments presented by both parties' counsel on what other courts describe as a "perplexing" issue.

Through the Act of 1934, Congress delegated oversight of the proxy solicitation process to the Securities and Exchange Commission ("SEC").  Id.  Section 14(a) of the Act "renders unlawful the solicitation of proxies in violation of the SEC's rules and regulations." Amalgamated Clothing, 821 F. Supp. at 881.  "Section § 14(a) and the SEC's implementing regulations seek 'to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation.'"  Id. at 881-82 (quoting J.I. Case Co. v. Borak, 377 U.S. 426, 431 (1964)).

Pursuant to its statutory authority, the SEC adopted Rule 14a-8, which affords shareholders "[a]ccess to management proxy solicitations to sound out management views and to communicate with other shareholders on matters of major import."  Roosevelt v. E.I. Du Pont de Nemours & Co., 958 F.2d 416, 421 (D.C. Cir. 1992) (Ginsburg, J.).  That rule governs the process for submitting shareholder proposals and explains when a company must include a shareholder proposal in its proxy statement.  To be eligible to submit a proposal, a shareholder must have continuously held "[a]t least $25,000 in market value of the company's securities entitled to vote on the proposal for at least one year."  17 C.F.R. § 240.14a-8(b)(1)(i)(C). Furthermore, the rule requires that shareholder proposals be limited to 500 words, id. § 240.14a-8(d), and be submitted to the company no later than 120 days before the publication of the company's proxy statement, id. § 240.14a-8(e)(2).[3]

Once these procedural requirements are met, Rule 14a-8 "requires a company to include a shareholder's proposal in the company's proxy statement and provide shareholders with the

---

[3] If a company finds that a shareholder failed to follow an eligibility or procedural requirement for submitting a proposal, it must first notify the shareholder in writing of any deficiencies.  17 C.F.R. § 240.14a-8(f)(1).  The shareholder must be given an opportunity to respond or correct the deficiency no later than fourteen days after receiving the company's notification.  Id.

opportunity to vote on the proposal" unless the proposal falls within one of thirteen enumerated

exclusions.  Amalgamated Clothing, 821 F. Supp. at 882.  Most relevant to this matter is Rule

14a-8(i)(7), which allows a company to exclude a shareholder proposal from its proxy materials

"[i]f the proposal deals with a matter relating to the company's ordinary business operation."  17

C.F.R. § 240.14a-8(i)(7).  Additionally, a company may exclude a proposal under Rule 14a-

8(i)(3) if it is "so inherently vague or indefinite that neither the stockholders voting on the

proposal, nor the company in implementing the proposal (if adopted), would be able to determine

with any reasonable certainty exactly what actions or measures the proposal requires."  Staff

Legal Bulletin No. 14B, § B.4, 2004 WL 3711971, at *4 (Sep. 15, 2004).

If a company wishes to invoke one of Rule 14a-8's grounds for exclusion, it must file its

reasons for excluding the proposal with the SEC's Division of Corporate Finance ("Division"),

no later than eighty days before it files its proxy materials with the SEC.  17 C.F.R. § 240.14a-

8(j)(1).  The shareholder advancing the proposal has the option to submit a response with the

Division.  Id. § 240.14a-8(k).

In past years, the Division's normal course of conduct has been to respond "in one of two

ways: (1) with a no-action letter, specifying that the company may omit the shareholder proposal

under the exclusion(s) it relied on; or (2) that it is 'unable to concur' with the company."  Trinity,

792 F.3d at 337.  However, the Division has taken a different approach for the 2025-26 proxy

season.  Doc. No. 1 ¶ 23.  On November 17, 2025, the SEC issued a statement informing

companies and shareholders that the Division would not be responding substantively to most of

the no-action requests submitted for 2025-26.  Id.  Instead, the SEC noted that the Division

would not object to a company's decision to exclude a proposal if the company submits an

"unqualified representation that [it] has a reasonable basis to exclude the proposal" under Rule

14a-8.  Id. (quoting Statement Regarding the Division of Corporation Finance's Role in the Exchange Act Rule 14a-8 Process for the Current Proxy Season, U.S. Sec. & Exch. Comm'n. (Nov. 17, 2025), https://www.sec.gov/newsroom/speeches-statements/statement-regarding-division-corporation-finances-role-exchange-act-rule-14a-8-process-current-proxy-season [https://perma.cc/PW2K-CULF]).

  B.  Factual Background

  The following facts are drawn from the complaint, Doc. No. 1, unless otherwise noted. On December 23, 2025, the Fund notified BJ's of a shareholder proposal that it intended to present at BJ's annual meeting for 2026.  Id. ¶ 17.  The Proposal, entitled "Report on Supply Chain Deforestation Impacts," included the following resolution:

> RESOLVED: Shareholders request that BJ's Wholesale Club Holdings, Inc. ("BJ's" or "the Company") conduct an assessment of risks of deforestation associated with its private-label brands within one year and provide a report summarizing the results. The report may, at management's discretion, be updated annually and include an assessment of forest degradation within the supply chain; feasible, time-bound target setting; third-party monitoring and verification; and assessment of the financial and operational implications of the related risks.

Id. ¶¶ 17-18.  The Fund also submitted the following supporting statements in its proposal:

> WHEREAS: More than half of global GDP is moderately or highly dependent on nature. Ongoing deforestation threatens to disrupt the reliability of the natural ecosystems and the global economy, creating potential material financial risks for companies and investors. The World Bank estimates that the degradation of natural system, could reduce global GDP by $2.7 trillion annually by 2030. BJ's use of commodities (e.g., beef, palm oil, soy and paper/pulp) associated with deforestation exposes its supply chain to the major drivers of global deforestation. Despite these risks, BJ's does not publicly disclose its policies or practices for assessing and managing deforestation risk. Moreover, the Company's removal of the sustainability report from its website further limits transparency into how these risks are addressed.
>
> The Company's 10-K identifies "consistent product quality, competitive pricing, and availability of these products is essential to developing and maintaining member loyalty to its private label brands," all of which depend on a stable and resilient supply chain. Deforestation threatens this resiliency, yet there is no clear indication that BJ's evaluates or mitigates related risks specifically for its private-

label offerings, for which the Company has direct control over product sourcing. This concern becomes increasingly consequential as BJ's "expect[s] to increase the sales penetration of [its] private-label items," which currently represent 25% of annual sales. Failure to assess these risks means growing private-label sales penetration could magnify deforestation risks, including supply chain disruptions, reputational damage, and material financial implications, all of which are key risks identified in the Company's 10-K.

Peer retailers such as Costco and Kroger have disclosed deforestation risk assessment results across their supply chains, including private-label products. Furthermore, competing consumer goods companies that produce products similar to BJ's private label brands such as Unilever, Kraft Heinz, and General Mills, have taken greater action on deforestation by implementing time-bound deforestation-free commitments across key commodities and enforcing rigorous traceability and supplier standards.

BJ's lack of comparable assessment and commitment to eliminate deforestation lags peers and limits the Company's ability to manage supply chain risks, mitigate reputational and operational vulnerabilities, and safeguard long-term performance. A robust assessment of deforestation risks, including within BJ's private-label offerings, Berkley Jensen and Wellsley Farms, would help ensure BJ's private-label growth is supported by responsible sourcing, sound governance, and effective risk management. We urge shareholders to vote FOR this proposal.

Id. ¶ 19.  To meet the eligibility requirements for submitting shareholder proposals under Rule

14a-8, the Fund certified that it had held at least $25,000 of BJ's shares for over a year and

intended to hold those shares through the date of BJ's 2026 annual meeting.  Id. ¶ 20.

On February 12, 2026, BJ's wrote to the Division, copying the Fund, notifying the

Division that BJ's intended to exclude the Proposal from its proxy materials for the 2026

meeting.  Id. ¶ 21.  In the letter, BJ's asserted that the Proposal is excludable under the "ordinary

business exclusion" of Rule 14a-8(i)(7).  Id.  BJ's did not raise other reasons for excluding the

Proposal.  BJ's also requested that the Division confirm that it would not object to the exclusion

of the Proposal.  Id. ¶ 25.  As of March 2, 2026 (the date the Fund filed its complaint in this

case), the Division had not provided the requested confirmation.  The Division ultimately

6

responded to BJ's letter on March 10, 2026, and confirmed that it would "not object if the Company excludes the Proposal from its proxy materials." Doc. No. 23-13 at 2.[4]

BJ's presently intends to finalize its 2026 proxy materials without including the Fund's Proposal. Under the SEC's rules, the earliest BJ's can file its proxy materials with the SEC is May 3, 2026—eighty days after its February 12 letter to the Division. 17 C.F.R. § 240.14a-8(j)(1). According to the declaration of BJ's Vice President of Investor Relations, BJ's plans to mail its proxy materials on May 6, 2026, which would require it to finalize all the materials by April 28, 2026. Doc. No. 25 ¶ 5.

### C.    Procedural History

This lawsuit commenced on March 2, 2026. The Fund advances one cause of action against BJ's—violation of Section 14(a) of the Act of 1934 and Rule 14a-8 promulgated thereunder—and seeks declaratory and injunctive relief. Seven days after filing the complaint, the Fund moved for an injunction preventing BJ's from excluding the Proposal from its 2026 proxy materials. Doc. No. 5. BJ's opposed the motion, Doc. No. 22, and the Fund replied, Doc. No. 29. BJ's also moved to dismiss the complaint under Rule 12(b)(6), Doc. No. 16, and the Fund opposed, Doc. No. 34. The Court held a hearing on the motions on April 21, 2026.

## II.    MOTION FOR INJUNCTIVE RELIEF

The Court begins with the Fund's motion for injunctive relief. A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that" (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the

---

[4] BJ's filed a copy of this March 10 letter as an exhibit to its opposition memorandum.

balance of equities tips in his favor," and (4) "an injunction is in the public interest." Id. at 20. The Court addresses these factors in turn.

    A.    <u>Likelihood of Success on the Merits</u>

        1.    *Private Right of Action*

As a threshold matter, BJ's argues that the Fund cannot succeed on the merits of its claim because Section 14(a) of the Act of 1934 does not provide a private right of action to enforce Rule 14a-8. Doc. No. 22 at 14. This argument fails. Courts have long held that "a private right of action is properly implied from section 14(a) . . . to enforce a company's obligation to include shareholder proposals in annual meeting proxy materials." <u>Roosevelt</u>, 958 F.2d at 417.

In an attempt to disrupt this longstanding view, BJ's argues that the Supreme Court's decision in <u>Alexander v. Sandoval</u> marked a reversal of the Court's approach to implying private rights of action from statutes, including Section 14(a). 532 U.S. 275 (2001). However, whether a private right of action exists under Section 14(a) was not at issue in <u>Sandoval</u>, which held that Section 602 of Title VII conferred no implied private right of action to enforce disparate-impact regulations because it contained no "rights-creating language." Id. at 288-89. The same deficiency is not found in Section 14(a). As another district court has explained:

> [T]he Supreme Court's decision in *Sandoval* does not establish that there is no private right of action under section 14(a) to enforce S.E.C. Rule 14a–8. Rule 14(a) has "rights-creating" language. Unlike section 602 of Title VI, which provides for agency enforcement, section 27 of the Exchange Act directs courts to enforce the rights and duties created by the Act. The statutory features behind the Supreme Court's decision in *Sandoval* are not present here.

<u>KBR Inc. v. Chevedden</u>, 776 F. Supp. 2d 415, 423-26 (S.D. Tex. 2011), <u>clarified on denial of reconsideration sub nom.</u> <u>KBR v. Chevedden</u>, No. CIV.A. H-11-0196, 2011 WL 6033039 (S.D. Tex. Dec. 5, 2011); <u>see also</u> <u>Heritage Found. v. Airbnb, Inc.</u>, No. CV 676-cv-GBW, 2026 WL

395797, at *4-6 (D. Del. Feb. 12, 2026) (finding that Sandoval did not eliminate private right of action under Section 14(a)).

BJ's does not address the fact that courts have continued to recognize a private right of action to enforce Rule 14a-8, even after the Sandoval decision.  See, e.g., Apache Corp. v. N.Y.C. Emps.'s Ret. Sys., 621 F. Supp. 2d 444, 453 (S.D. Tex. 2008) (adjudicating claim under Section 14(a) to enforce Rule 14a-8 without addressing whether private right of action exists); Tosdal v. Nw. Corp., 440 F. Supp. 3d 1186, 1200-01 (D. Mont. 2020) (same).  Nor does BJ's cite any federal cases declining to find a private right of action under Section 14(a) to enforce Rule 14a-8—before or after Sandoval.  To the contrary, BJ's relies heavily on a case in which the Third Circuit presumed that such a private right of action exists.  See Trinity, 792 F.3d at 337 ("A shareholder dissatisfied with the [SEC] staff's response [to its proposal] can, as Trinity did here, pursue its rights against the company in federal court.").  Following the lead of the many courts that have addressed the issue, this Court finds that the Fund has the right to challenge violations of Rule 14a-8 in federal court and rejects BJ's arguments to the contrary.

### 2.    *Eligibility and Procedural Requirements*

The complaint sufficiently alleges that the Fund complied with the eligibility and procedural requirements under Rule 14a-8 when it submitted the Proposal.  According to the complaint, the Fund had owned at least $25,000 of shares for more than one year at the time it submitted the Proposal, and it intended to hold those shares through the 2026 annual meeting. Id. ¶ 20.  This meets the eligibility criteria under Rule 14a-8.  17 C.F.R. § 240.14a-8(b)(i)-(ii). Furthermore, pursuant to the Rule, the Proposal did not exceed 500 words.  Id. § 240.14a-8(d). The Proposal was also submitted at least 120 days before the date BJ's published its proxy statement for the previous year's annual meeting.  Id. § 240.14a-8(e)(2).

In its February 12 letter to the Division, BJ's did not raise any procedural deficiencies with the Proposal. Doc. No. 6 at 12. Nor does BJ's raise any such challenges in its opposition memorandum. Therefore, the Court finds that the Proposal cannot be excluded from the proxy materials on the basis of any procedural or eligibility-based deficiency.

### 3. *Ordinary-Business Exclusion*

While BJ's does not dispute the Fund's procedural compliance with Rule 14a-8, it contends the contents of the Proposal fall under the ordinary-business exclusion. As explained above, Rule 14a-8(i)(7) allows a company to exclude a shareholder proposal if it "deals with a matter relating to the company's ordinary business operations." 17 C.F.R. § 240.14a–8(i)(7). How to interpret and apply this broadly worded exclusion remains unclear. As noted in a recent District of Columbia case, there are only a "few cases addressing Rule 14a-8(i)(7)," and the meaning of the exclusion remains "perplexing." As You Sow v. Chubb Ltd., No. CV 26-734 (SLS), 2026 WL 879666, *5-7 (D.D.C. Mar. 31, 2026); see also Trinity, 792 F.3d at 337 (describing ordinary-business exclusion as "most perplexing" exclusion under Rule 14a-8).

To assist in deciphering the ordinary-business exclusion, BJ's asks the Court to rely on the SEC's interpretive releases commenting on the exclusion's meaning. Doc. No. 22 at 14. Since adopting the ordinary-business exclusion in 1976, the SEC has issued two releases providing additional guidance on the exclusion. See Adoption of Amendments Relating to Proposals by Security Holdings, Exchange Act Release No. 12999, 41 Fed. Reg. 52994 (Nov. 22, 1976) ("1976 Release"); Amendments to Rules on Shareholder Proposals, Exchange Act Release No. 40018, 63 Fed. Reg. 29106 (May 28, 1998) ("1998 Release"). BJ's asserts that these interpretations provide the SEC's reasonable reading of a genuinely ambiguous regulation and consequently warrant deference. Doc. No. 22 at 15 (citing Kisor v. Wilkie, 588 U.S. 558 (2019)). The Fund does not oppose deference to the SEC's releases and relies on them in its

memorandum.  See Doc. No. 6 at 12-13.  In light of the parties' joint reliance on the SEC's

interpretive releases, the Court follows their lead and looks to the releases to evaluate whether

the Proposal falls under the ordinary-business exclusion.[5]  See Chubb, 2026 WL 879666, at *7

(adopting same course in similar circumstances).

In the 1976 Release, the SEC explained that Rule 14a–8(i)(7) permits exclusion of

"proposals involv[ing] business matters that are mundane in nature and [that] do not involve any

substantial policy or other considerations," which the agency contrasted with "matters which

have significant policy, economic or other implications inherent in them."  41 Fed. Reg. at

52998.  The SEC went further in fleshing out this distinction in the 1998 Release.  There, the

SEC explained that there are "two central considerations" for determining whether a proposal

infringes upon a company's ordinary business operations: (1) whether the proposal's "subject

matter" is "so fundamental to management's ability to run a company on a day-to-day basis that

[it] could not, as a practical matter, be subject to direct shareholder oversight," and (2) the degree

to which a proposal seeks to "micro-manage" the company.  61 Fed. Reg. at 29108.

The Court begins with the first consideration—the Proposal's subject matter.  Regarding

this, the 1998 Release provided the following commentary:

> Certain tasks are so fundamental to management's ability to run a company on a
> day-to-day basis that they could not, as a practical matter, be subject to direct
> shareholder oversight. Examples include the management of the workforce, such
> as the hiring, promotion, and termination of employees, decisions on production
> quality and quantity, and the retention of suppliers. However, proposals relating to
> such matters but focusing on sufficiently significant social policy issues (e.g.,
> significant discrimination matters) generally would not be considered to be

---

[5] Both parties similarly rely on and cite to "Staff Legal Bulletins" issued by the Division that
express its views about interpreting Rule 14a-8 and the SEC's releases.  BJ's argues that the
Staff Legal Bulletins should receive deference under Skidmore.  Doc. No. 22 at 15.  In light of
both parties' reliance on the Staff Legal Bulletins, the Court agrees to consider them.  See also
Chubb, 2026 WL 879666, at *7 (noting that "recent cases on Rule 14a-8(i)(7) have afforded the
bulletins careful consideration" and collecting cases).

excludable, because the proposals would <u>transcend the day-to-day business matters</u> and raise policy issues so significant that it would be appropriate for a shareholder vote.

<u>Id.</u> (emphasis added).  This distinction between ordinary-business matters and matters that "transcend" them lies at the heart of the parties' dispute.  The Fund argues that the Proposal "focuses on the significant policy issue of global deforestation as it[] concerns the planet's climate and thus transcends BJ's day-to-day business."  Doc. No. 6 at 15.  Meanwhile, BJ's asserts that the Proposal's subject matter is BJ's supply chain, which relates to day-to-day business matters and falls under the ordinary-business exclusion.  Doc. No. 22 at 16-17.

The pertinent question here is how to draw the line between day-to-day business matters and matters "focusing on sufficiently significant social policy issues" that "transcend the day-to-day business matters."  The parties advance different methods for drawing that line.  Relying on the majority opinion in the <u>Trinity</u> case, BJ's argues that for subject matter to "transcend" the company's ordinary business, the policy issue must be "divorced from how a company approaches the nitty-gritty of its core business."  <u>Id.</u> at 17 (quoting <u>Trinity</u>, 792 F.3d at 346-47).  Accordingly, BJ's argues that even though the Proposal raises significant social policy issues (i.e., deforestation and climate change), it does not adequately "transcend" BJ's ordinary business operations because it treads upon core business matters, such as how BJ's sources its private-label products and how BJ's selects vendors and suppliers in its supply chain.  <u>Id.</u> at 18; <u>see also</u> <u>Trinity</u>, 792 F.3d at 351 ("We thus hold that, even if [plaintiff's] proposal raises sufficiently significant social and corporate policy issues, those policies do not transcend the ordinary business operations of [the defendant].").

On the other hand, the Fund contends that the determination in <u>Trinity</u>'s majority opinion that a proposal must be "divorced from" a company's ordinary business operations in order to "transcend" the exclusion incorrectly applies Rule 14a-8 and the SEC's releases.  Doc. No. 29 at

12

3 n.4.  The Fund argues that the Court should instead look to the concurring opinion in Trinity, which noted that "whether a proposal focuses on an issue of social policy that is sufficiently significant is not separate and distinct from whether the proposal transcends a company's ordinary business.  Rather, a proposal is sufficiently significant 'because' it transcends day-to-day business matters."  792 F.3d at 353 (Shwartz, J., concurring).  Indeed, the Division has previously endorsed this concurring opinion while rejecting the Trinity majority's approach.  In a Staff Legal Bulletin issued after Trinity, the Division noted that "the new analytical approach introduced by the Third Circuit [in Trinity] goes beyond the Commission's prior statements and may lead to the unwarranted exclusion of shareholder proposals."  Staff Legal Bulletin No. 14H, § C, 2015 WL 6503673, *6 (Oct. 22, 2015).  The Division further explained:

> [A]s the concurring judge [in Trinity] explained, the Commission has stated that proposals focusing on a significant policy issue are not excludable under the ordinary business exception "*because* the proposals would transcend the day-to-day business matters and raise policy issues so significant that it would be appropriate for a shareholder vote."  Thus, a proposal may transcend a company's ordinary business operations even if the significant policy issue relates to the "nitty-gritty of its core business."  Therefore, proposals that focus on a significant policy issue transcend a company's ordinary business operations and are not excludable under Rule 14a-8(i)(7).

Id.

The Court is persuaded by the approach advanced by the concurring opinion in Trinity and the Staff Legal Bulletin.  The 1998 Release clearly states that "proposals . . . focusing on sufficiently significant social policy issues . . . generally would not be considered to be excludable, because the proposals would transcend the day-to-day business matters."  61 Fed. Reg. at 29108 (emphasis added).  Nowhere does the SEC's interpretation of Rule 14a-8 indicate that the proposal must also be "divorced" from the day-to-day business operations of a company, as the Trinity majority contends.

With the proper interpretive approach of Rule 14a-8(i)(7) resolved, the Court addresses whether the Fund's Proposal "focus[es] on sufficiently significant social policy issues" and thereby falls outside the scope of the ordinary-business exclusion. Here, the Proposal requests that BJ's "conduct an assessment of risks of deforestation associated with its private-label brands within one year and provide a report summarizing the results." Doc. No. 1 ¶ 18. The Fund's supporting statements elaborate on the larger policy issue of deforestation, noting that "[m]ore than half of global GDP is moderately or highly dependent on nature" and that "deforestation threatens to disrupt the reliability of the natural ecosystems and the global economy." Id. ¶ 19. The Proposal further ties this social policy issue back to BJ's private-label brands, warning that BJ's failure to evaluate the deforestation risks of its private-label brands has become "increasingly consequential" as BJ's "expect[s] to increase the sales penetration of [its] private-label items," which "currently represent 25% of annual sales."[6] Id. The focus of the Proposal is clearly on the deforestation risks arising from BJ's private-label brands, and the mere fact that the Proposal touches on ordinary business matters (i.e., BJ's supply-chain) does not change the nature of this focus.

In this manner, the Proposal is distinguishable from other shareholder proposals that have been found to fall within the ordinary-business exclusion. In a recent case, another district court found that UnitedHealth was entitled to exclude a shareholder proposal requesting its Board to

---

[6] BJ's notes that a recent Staff Legal Bulletin encourages "a company-specific approach in evaluating significance" because "a policy issue that is significant to one company may not be significant to another." Doc. No. 39 at 8 (citing Staff Legal Bulletin No. 14M § C.2 (Feb. 12, 2025)). Here, the Proposal positions the significant policy concern of deforestation in relation to company-specific issues. Namely, the Proposal focuses on the deforestation risks associated with BJ's private-label brands—a growing portion of BJ's business that already accounts for a quarter of the company's sales. Indeed, BJ's acknowledges that its private-label brands amount to "a sizeable portion of BJ's business." Doc. No. 22 at 20.

"publish a report, at reasonable expense and omitting proprietary and confidential information, describing the healthcare consequences of its acquisitions over the past 10 years" under the ordinary-business exclusion. Fonds Des Missions v. UnitedHealth Grp. Inc., No. 26-cv-970, 2026 WL 1018600, at *3 (D.D.C. Apr. 15, 2026). While the proposal touched on significant social policy issues (i.e., the cost and quality of healthcare services), it did not "focus" on these issues. Id. at *9. This was because the proposal called on UnitedHealth to review all of its acquisitions for the past decade, even small and routine acquisitions that had not directly impacted UnitedHealth's healthcare services. Id. Based on its expansive reach, the court cautioned that the proposal "could excessively sweep in mundane aspects of UnitedHealth Group's acquisitions and thus fall within Rule 14a-8(i)(7)'s ambit." Id.

The same concern does not exist here because the Fund's Proposal requires BJ's to evaluate only those features of its private-label brands that have to do with deforestation risks. To the extent that the Proposal requires BJ's to probe into its operations, it calls on BJ's to assess and report on only those aspects of its private-label brands that play a role in deforestation risks. Unlike the proposal in UnitedHealth, the Fund's Proposal does not require BJ's to evaluate every acquisition or transaction involving its private-label brands (or even every private-label product), which would "excessively sweep in mundane aspects" of BJ's business unrelated to the central policy issue of deforestation. Id.

This situation is also distinguishable from As You Sow v. Chubb, another recent district court case. There, the shareholders requested that the defendant, an insurance company, issue "a third-party report assessing if and how pursuing subrogation claims for climate-related losses would benefit the Company and its insureds." 2026 WL 879666, at *3. The court found that the proposal fell under the ordinary-business exclusion because its clear focus was on the company's

15

decisions about whether to subrogate claims—hitting the very core of an insurance company's day-to-day business determinations.  Id. at *8.  Here, the Fund's Proposal focuses on a potential generalized risk—deforestation—posed by one aspect of BJ's business.  The Proposal does not focus on whether BJ's should offer private-label brands or particular products, how BJ's should source its private-label products, or any other decision made in the course of BJ's ordinary business.  To the extent the Proposal's requested assessment of deforestation risks may impact BJ's decisions regarding its supply-chain in the future, this impact is an incidental byproduct— rather than the focus—of the Proposal, and a matter committed to the discretion of management (absent a future shareholder vote affecting that discretion in some way).

For similar reasons, even the majority ruling in Trinity is inapplicable here.  There, the excluded proposal sought to make Walmart establish and implement standards governing the sale of a specific product—firearms.  792 F.3d at 329-30.  The Fund's Proposal is different.  It does not seek to alter BJ's sale of any particular item or category of items.  Nor does it seek to change the policies, procedures, or decision-making governing BJ's sales practices.  It merely requires BJ's to conduct an assessment analyzing the risks of deforestation associated with its private-label brands.  The Proposal does not require BJ's to do anything further with regard to how it sources or produces its private-label products.  Under these circumstances, the Fund is likely to succeed in establishing that the Proposal focuses on "sufficiently significant social policy issues" such that it "transcend[s] [BJ's] day-to-day business matters."  61 Fed. Reg. at 29108.

This does not end the Court's analysis of the ordinary-business exclusion, however.  Even if a proposal focuses on a sufficiently significant social policy, the proposal can still be excluded if it "seeks to 'micro-manage' the company by probing too deeply into matters of a complex nature upon which shareholders, as a group, would not be in a position to make an

16

informed judgment." Id.  As explained in the 1998 Release, this consideration "may come into play in a number of circumstances, such as where the proposal involves intricate detail, or seeks to impose specific time-frames or methods for implementing complex policies." Id.  However, the 1998 Release also cautioned that not "all proposals seeking detail, or seeking to promote time-frames or methods" amount to "ordinary business," because "[t]iming questions, for instance, could involve significant policy where large differences are at stake, and proposals may seek a reasonable level of detail without running afoul of these considerations." Id. at 29109.

BJ's argues that the Proposal micromanages the company because it "requires 'intricate detail' on, and intrudes into, daily decisions regarding management of the supply chain for particular products." Doc. No. 22 at 20.  This argument is unconvincing.  Nothing about the Proposal requires "intricate detail" about BJ's daily business decisions.  The Proposal broadly asks that BJ's produce an assessment into the deforestation risks associated with its private-label brands.  It does not require BJs to analyze the deforestation risks of particular business decisions or to follow a specific method of analysis.  All the granular considerations about how to conduct the assessment are left to BJ's discretion, including whether to assess the deforestation risks from a 40,000 foot view or on a microscopic level.[7]  See also UnitedHealth Grp., 2026 WL 1018600, at *11 (declining to find that proposal micromanaged company because it was "imprecise as to

---

[7] The declaration of Amanda Irish, BJ's Senior Vice President/General Manager of Own Brands and Innovation, asserts that the Proposal, if accepted, would "require BJ's to divert significant resources" and "would also inevitably impact vendor relationships and, as a result, BJ's potential bargaining power vis-à-vis these vendors." Doc. No. 24 ¶ 19.  Specifically, she notes that "BJ's does not, as a general matter, have detailed visibility into private-label vendors' transportation or other supplier relationships" and contends that BJ's would need to embark on numerous steps to acquire the rights to obtain relevant information from various parties in its supply chain. Id. ¶¶ 11-14.  This is certainly one way of fulfilling the Proposal, but there are a variety of good-faith ways to perform the requested assessment, some of which do not involve such probing of individual suppliers.  The Proposal, as written, does not require any particular level of detail, let alone the scope of information laid out in Irish's declaration.

the nature and amount of information that should be in the report"). To the extent that the Proposal requires the assessment to be completed within a year, this time-limit, alone, does not suggest an improper degree of micromanagement. As the 1998 Release makes clear, proposals with a particular time frame do not automatically amount to micromanagement. Here, the one-year deadline does not improperly circumscribe the authority of BJ's management, especially where the rest of the Proposal leaves the company with substantial discretion in carrying out the assessment.

The open-ended nature of the Proposal also distinguishes it from the no-action letters cited by BJ's.[8] In Home Depot, shareholders requested that the Board of Directors "issue a public report, within a reasonable time, assessing the benefits and drawbacks of permanently committing not to sell paint containing titanium dioxide sourced from the Okefenokee, and assessing risks to the company associated with same." The Home Depot, Inc., S.E.C. Staff No-Action Letter, 2024 WL 278581, at *2 (Mar. 21, 2024). In Kroger, shareholders submitted a proposal requesting that "the Board take the necessary steps to pilot participation in the Fair Food Program for the Company's tomato purchases in the Southeast United States, in order mitigate severe risks of forced labor and other human rights violations in Kroger's produce supply chain." The Kroger Co., S.E.C. Staff No-Action Letter, 2023 WL 2060070, at *2 (Apr. 25, 2023). In both cases, the SEC issued letters expressing the agency's view that the proposals sought to micromanage the company.

---

[8] The parties agreed during the hearing that the Division's no-action letters warrant "minimal reliance" from the Court. The Court addresses and considers some of the no-action letters cited in the parties' briefing as mere illustrative tools, rather than as agency interpretations requiring deference.

The Fund's Proposal is highly distinguishable from both situations.  Unlike <u>Home Depot</u>, the Fund's Proposal does not require BJ's to assess and report on a granular topic (selling items containing a particular chemical sourced from a specific location).  And, far from <u>Kroger</u>, the Proposal does not mandate that BJ's take "steps" toward a particular outcome or business decision.  Instead, the Proposal leaves any future decision-making regarding BJ's supply chain and other business operations squarely in the hands of the company.  For all the foregoing reasons, the Court finds that the Fund is likely to succeed on its claim that the Proposal was improperly excluded under Rule 14a-8(i)(7).

### 4.    *Other Grounds for Exclusion*

In addition to the ordinary-business exclusion, BJ's raises two other grounds for excluding the Proposal from its proxy materials.  Upon review, the Court finds that both grounds are inapplicable to this case.

First, BJ's argues that the Proposal is excludable under Rule 14a-8(i)(1), which allows the exclusion of a proposal that "is not a proper subject for action by shareholders under the laws of the jurisdiction of the company's organization"—in this case, Delaware.  17 C.F.R. § 240.14a-8(i)(1).  BJ's contends that the Proposal is "improper under Delaware law for the same reasons it fails under the ordinary business exclusion," because Delaware law prohibits shareholders from meddling in the ordinary business operations of a corporation.  Doc. No. 22 at 20-21; <u>see also</u> <u>Amalgamated Clothing</u>, 821 F. Supp. at 882-83 ("A shareholder proposal pertaining to 'ordinary business operations' would be improper if raised at an annual meeting, because the law of most states (including Delaware) leaves the conduct of ordinary business operations to corporate directors and officers rather than the shareholders.").  Because the Court has already found that the Proposal is not excludable under the ordinary-business exclusion, the Court also rejects BJ's argument that it is excludable under an analogous Delaware law.  Neither party contends that

19

BJ's argument regarding Delaware law differs in any material way from its argument regarding Rule 14a-8's ordinary-business exclusion.

Second, BJ's argues that the Proposal is impermissibly vague. Rule 14a-8(i)(3) allows for the exclusion of proposals and supporting statements that are "materially false or misleading." 17 C.F.R. § 240.14a-8(i)(3). Staff Legal Bulletin No. 14B notes that Rule 14a-8(i)(3) also allows for the exclusion of proposals that are overly vague or indefinite:

> [R]eliance on rule 14a-8(i)(3) to exclude or modify a statement may be appropriate where . . . the resolution contained in the proposal is so inherently vague or indefinite that neither the stockholders voting on the proposal, nor the company in implementing the proposal (if adopted), would be able to determine with any reasonable certainty exactly what actions or measures the proposal requires—this objection also may be appropriate where the proposal and the supporting statement, when read together, have the same result.

Staff Legal Bulletin No. 14B, § B.4, 2004 WL 3711971, at *4 (Sep. 15, 2004). Invoking this basis for exclusion, BJ's argues that the Proposal is vague for the following reasons:

- "The 'Resolved' clause of the Proposal requests an assessment on deforestation risk 'associated with [BJ's] private labels,' but the 'Whereas' clauses refer to '[a] robust assessment of deforestation risks, including within BJ's private-label offerings.'"

- "The Proposal also fails to specify the scope of the requested assessment. For instance, the Proposal provides a non-exhaustive list of commodities—'e.g., beef, palm oil, soy and paper/pulp'—that are purportedly 'associated with deforestation' without explaining what that means or what other commodities might qualify."

- "[T]he Proposal [does not] identify what constitutes the 'risks of deforestation' at issue, leaving the Proposal seemingly unbounded in scope."

- "[T]he Proposal does not clarify whether the assessment must examine deforestation risks imposed *on* the supply chain, or *by* the supply chain."

Doc. No. 22 at 21-22.

There are several problems with BJ's vagueness argument. As a preliminary matter, BJ's never raised the Proposal's vagueness in its February 12 letter to the SEC. Under Rule 14a-8(j),

20

a company that intends to exclude a shareholder proposal must "file its reasons with the

Commission no later than 80 calendar days before it files its definitive proxy statement" and

provide a copy to the shareholder; the company must also provide an "explanation of why the

company believes that it may exclude the proposal, which should, if possible, refer to the most

recent applicable authority, such as prior Division letters issued under the rule."  17 C.F.R.

§ 240.14a-8(j)(i)-(ii).[9]  In its letter to the SEC, BJ's raised the ordinary-business exclusion as its

only basis for excluding the Proposal.  See Doc. No. 7-2.  At no point in that letter did BJ's

mention or even hint that the Proposal was impermissibly vague.  Nonetheless, at the hearing, the

Fund's counsel conceded that BJ's failure to raise this exclusion in its letter to the SEC poses no

bar to BJ's invocation of the exclusion in this federal case.[10]  Therefore, the Court turns to

evaluating the merits of BJ's vagueness arguments.  They fall short.

A proposal may be excluded if it is "so vague and ambiguous that the issuer and security

holders would not be able to determine what action the proposal is contemplating."  Trinity, 792

---

[9] Notably, BJ's was required to comply with these requirements even though the Division had recently changed its approach to no-action letters.  In its public notice about the 2025-26 proxy season, the Division made clear that "companies that intend to exclude shareholder proposals from their proxy materials must still notify the Commission and proponents" pursuant "to Rule 14a-8(j)."  See Statement Regarding the Division of Corporation Finance's Role in the Exchange Act Rule 14a-8 Process for the Current Proxy Season, U.S. Sec. & Exch. Comm'n. (Nov. 17, 2025), https://www.sec.gov/newsroom/speeches-statements/statement-regarding-division-corporation-finances-role-exchange-act-rule-14a-8-process-current-proxy-season [https://perma.cc/PW2K-CULF].

[10] The better practice would have been for BJ's to raise vagueness as a basis for exclusion in its letter to the SEC, especially because the SEC does not view blanket exclusion as the only remedy for impermissibly vague proposals.  See Staff Legal Bulletin No. 14B, § B.4, 2004 WL 3711971, at *4 (Sep. 15, 2004) (noting that companies may rely on Rule 14a-8(i)(3) "to exclude or modify" proposals and supporting statements).  Indeed, "when a proposal is sought to be excluded on SEC Rule 14a-8(i)(3) grounds, the SEC staff will usually require the proponent to revise its proposal to remove any vague or misleading statements."  3 Brent A. Olson, Publicly Traded Corporations Handbook § 10:14 (2025).  Here, BJ's identifies four aspects of the Proposal that it contends are improperly vague, but it has not argued or shown why these alleged defects could not have been cured through modification, rather than total exclusion.

F.3d at 355 (Shwartz, J., concurring) (citing SEC's 1982 Proposing Release).  Here, the Fund's Proposal contains sufficient detail to inform readers what action is contemplated.  The Proposal calls on BJ's to evaluate the "risks of deforestation associated with its private-label brands." Doc. No. 1 ¶ 18.  While BJ's argues that one line from the supporting statements ("A robust assessment of deforestation risks, including within BJ's private-label offerings") makes it unclear whether "the requested assessment focuses on the private-label offerings or extends to all products," a reasonable reading of the Proposal and the supporting statement in their totality confirms that the assessment specifically pertains to BJ's private-label brands.

To begin, the line with which BJ's takes issue comes from a sentence that reads in its entirety:  "A robust assessment of deforestation risks, including within BJ's private-label offerings, Berkley Jensen and Wellsley Farms, would help ensure BJ's private-label growth is supported by responsible sourcing, sound governance, and effective risk management."  Id. ¶ 19 (emphasis added).  The conclusion of this sentence highlights that the requested assessment pertains to "BJ's private-label growth" and does not, in any way, suggest that the assessment covers all of BJ's products.  The remainder of the supporting statement similarly expresses a focus on BJ's private-label brands, noting that "there is no clear indication that BJ's evaluates or mitigates [deforestation] risks specifically for its private-label offerings," and that the "[f]ailure to assess these risks means growing private-label sales penetration could magnify deforestation risks."  Id.  In this light, the Proposal and the supporting statement make clear that the scope of the requested assessment concerns BJ's private-label brands.

BJ's also asserts that the Proposal does not clarify whether the assessment must examine deforestation risks imposed on the supply chain or by the supply chain.  The Court again looks to the language of the Proposal.  The requested assessment into the "risks of deforestation

22

associated with [BJ's] private-label brands" suggests a study of risks imposed both on and by

BJ's private-label brands.  The supporting statement supports this reading.  It cautions that

deforestation could "threaten" the "resiliency" of BJ's private-label brands and further notes that

private-label sales "could magnify deforestation risks."  Id.  Any individual reading the Proposal

and the supporting statement would reasonably understand that the requested assessment covers

both (1) how deforestation risks impact BJ's private-label brands and (2) how the private-label

brands affect deforestation.

Finally, BJ's complains that the Proposal is insufficiently precise, arguing that it fails to

specify what commodities must be assessed or what constitutes "risks of deforestation."  But

these contentions overlook the fact that the Proposal must and does leave sufficient room for

BJ's to exercise its managerial judgments in implementing the requested assessment.  It is worth

noting here that evaluating whether a shareholder proposal is impermissibly vague presents a

delicate balancing act.  Shareholder proposals must be open-ended enough to avoid

micromanaging the company but specific enough to allow shareholders to determine with

"reasonable certainty exactly what actions or measures the proposal requires."  Staff Legal

Bulletin No. 14B, § B.4, 2004 WL 3711971, at *4 (Sep. 15, 2004).  Accordingly, "[t]here often

is a fine line between overly vague and sufficiently specific proposals."  3 Thomas Lee Hazen,

Treatise on The Law of Securities Regulation § 10:38 (2025).  Here, the Court declines to find

that BJ's vagueness argument undermines the Fund's likelihood of success on the merits.  To the

extent the Proposal leaves some aspects of the assessment to BJ's discretion and interpretation, it

contains enough specificity to put shareholders and the company on notice of what action it

contemplates—an assessment of deforestation risks, the details and scope of which are

committed to the sound discretion of BJ's management.  For these reasons, the Court rejects BJ's

objection to the Proposal on vagueness grounds.  Because all of BJ's arguments for excluding the Proposal are unavailing, the Court finds that the Fund is likely to succeed on the merits of its Section 14(a) claim.

B.    Irreparable Harm

The next inquiry in the preliminary-injunction analysis is whether the Fund will suffer irreparable harm if the injunction is denied.  The Fund argues that exclusion of the Proposal from BJ's proxy materials will cause irreparable harm by (1) preventing the Fund from communicating the Proposal to shareholders, and (2) depriving shareholders who do not attend the annual meeting of their right to be informed about the Fund's Proposal.  Doc. No. 6 at 17.  To support these arguments, the Fund cites two cases finding that a company's wrongful exclusion of a shareholder's proposal presents an irreparable harm because the shareholder "los[es] the opportunity to communicate his concern with those shareholders not attending the upcoming shareholder meeting.'"  Lovenheim v. Iroquois Brands, Ltd., 618 F. Supp. 554, 561 (D.D.C. 1985); accord. N.Y.C. Emps.'s Ret. Sys. v. Am. Brands, Inc., 634 F. Supp. 1382, 1388 (S.D.N.Y. 1986).

By contrast, BJ's argues that the exclusion of a proposal does not per se amount to irreparable harm.  BJ's relies on eBay, a patent-infringement case where the Supreme Court "rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed."  eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 392-93 (2006).  There, the Court held that courts must assess motions for injunctions on a case-by-case basis by applying the "traditional four-factor test" instead of categorically granting or denying injunctions in certain types of patent claims. Id. at 393-94.  While BJ's implies that the two cases cited by the Fund are obsolete due to the Court's ruling in eBay, Doc. No. 22 at 22, BJ's has not explained how or why eBay, a patent

24

case, is dispositive here.  Nor has BJ's cited any cases applying eBay to claims under Section 14(a) and Rule 14a-8 in the manner BJ's urges.

More convincingly, BJ's cites a District of New Jersey case rejecting a shareholder's assertion of irreparable harm under Rule 14a-8.  Doris Behr 2012 Irrevocable Tr. v. Johnson & Johnson, No. 19-cv-8828, 2019 WL 1519026 (D.N.J. Apr. 8, 2019).  There, the plaintiff sought a preliminary injunction requiring the defendant to include its proposal in its proxy materials.  In its briefing, the plaintiff merely noted that it would "suffer irreparable harm if its proposal is excluded from consideration at the upcoming shareholder['s] meeting," citing the same two cases relied on by the Fund in this matter.  Id. at *3.  The court rejected this argument, noting that the plaintiff had failed to address "why its shareholder proposal must be specifically included in [that year's] proxy materials" given the plaintiff's stated intent to renew the proposal every year "until the proposal is adopted by the shareholders."  Id. at *4.

Overall, the cases cited by the parties reveal a disagreement as to whether a shareholder's inability to present an improperly excluded proposal at a given annual meeting amounts to irreparable harm.  While Doris Behr suggests that excluding a proposal does not present an irreparable harm where the shareholder can submit the same proposal the following year, American Brands indicates that such argument "fails to recognize the uniqueness of each annual shareholder meeting" and that the "shareholder proposal rule is perhaps the only means by which a shareholder" may exercise "any meaningful corporate suffrage."  634 F. Supp. at 1388.  This dispute in the existing case law and the absence of binding First Circuit precedent makes the question of irreparable harm a close issue in this matter.  However, based on the particular facts and circumstances of this case as well as the important right of the shareholder to participate in

corporate governance, the Court finds that the Fund will face irreparable harm without an injunction.

First, Doris Behr is distinguishable from this case.  In Doris Behr, the plaintiff did not move for a preliminary injunction until several weeks after the defendant had distributed its proxy materials, despite having been aware of the defendant's intent to exclude the proposal for over a month.  2019 WL 1519026, at *4.  In finding that the plaintiff would not suffer irreparable harm, the court emphasized the plaintiff's tardiness in moving for injunctive relief and noted that the delay "undermines any arguments of immediate irreparable harm."  Id.  Not so here.  The Fund did not lay in wait to seek relief.  Indeed, it filed this action just two weeks after learning about BJ's decision to exclude its proposal and over a month before BJ's anticipated publication of its proxy materials.

Second, the most fulsome resolution of the Fund's claim—reaching a final judgment on the merits in time for this year's annual meeting—is not feasible here considering the significant time constraints of this case.  BJ's deadline to finalize its proxy materials for this year's annual meeting is April 28, 2026—less than a week from now.  During the April 21 hearing, the Court raised the possibility of scheduling a bench trial before the April 28 deadline.  However, neither party was prepared to commit to an expedited trial, as both parties, understandably, want more time to confer with their clients and to evaluate what, if any, evidence they would offer at trial beyond what is already before the Court.

Thus, as a practical matter, the Court will be unable to reach a final judgment on the merits before BJ's deadline to finalize its proxy materials.  This reality contributes to a finding of irreparable harm because, absent a preliminary injunction, the Fund has no way of remedying the exclusion of its Proposal from this year's annual meeting, even though it is likely to succeed on

26

the merits of its claim.  See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18 (1st

Cir. 1996) (noting that to show irreparable harm, "[i]t is usually enough if the plaintiff shows that

its legal remedies are inadequate").  For all these reasons, the Court finds that the Fund will

suffer irreparable harm absent a preliminary injunction.

        C.      Balance of Equities

        The Court also finds that the balance of equities favors the Fund.  "The heart" of this

balancing test is "whether the harm caused [to the] plaintiff without the injunction, in light of the

plaintiff's likelihood of eventual success on the merits, outweighs the harm the injunction will

cause defendants."  Vargas-Figueroa v. Saldana, 826 F.2d 160, 162 (1st Cir. 1987).  As

explained above, given that the Fund is likely to succeed on its Section 14(a) claim, it stands to

suffer irreparable harm if the Proposal is wrongly excluded from this year's proxy materials.

        BJ's argues that it would incur significant costs if the injunction were granted.  Relying

on a declaration of its Vice President of Investor Relations, BJ's asserts that it will have to

"spend between $30,000 and $300,000" to include the Fund's Proposal in its proxy materials for

this year.  Doc. No. 22 at 25; Doc. No. 25 ¶¶ 7-10.  The Fund disputes this estimation, noting that

the SEC estimates "the cost to print and mail a single shareholder proposal at $18,982."  Doc.

No. 29 at 6 (citing Procedural Requirements and Resubmission Thresholds Under the Exchange

Act Rule 14a-8, Exchange Act Release No. 34-8996485, 85 Fed. Reg. 70240, 70274 (Nov. 4,

2020)).

        Regardless of the precise cost BJ's would incur, BJ's has not shown that this cost

outweighs the harm of improperly excluding the Proposal.  As a preliminary matter, BJ's has not

argued that the cost of including the Proposal would, in any way, interfere with its ability to

operate its multi-billion-dollar business.  See Doc. No. 23-1 at 40 (BJ's Form 10-K estimating

net sales for 2025 at $20.96 billion).  Furthermore, given the Fund's likelihood of success on the

27

merits, the expense of including the Proposal in the proxy materials merely reflects the cost of complying with Rule 14a-8.  The injunction does not require BJ's to do anything besides fulfill its corporate obligations under securities laws and regulations.  Indeed, BJ's raises no other cost it would endure from the injunction besides the cost of publishing the Proposal in its proxy materials.  To the extent this cost causes any harm, the Court's imposition of a bond (which is discussed below) ameliorates such harm.  On these facts, the balance of equities clearly tips in favor of the Fund.

### D.    Public Interest

For similar reasons, an injunction favors the public interest.  The SEC promulgated Rule 14a-8 "to catalyze what many hoped would be a functional 'corporate democracy.'"  Trinity, 792 F.3d at 335 (quoting Alan R. Palmiter, The Shareholder Proposal Rule: A Failed Experiment in Merit Regulation, 45 Ala. L. Rev. 879, 879 (1994)).  Rule 14a-8 ensures that shareholders have "[a]ccess to management proxy solicitations . . . to communicate with other shareholders on matters of major import."  Roosevelt, 958 F.2d at 421.  Infringing upon a shareholder's right to participate in the corporate-governance process pursuant to Rule 14a-8 undermines this regulatory regime.

Of course, this does not give shareholders free rein to deluge a corporation's annual meeting with endless proposals.  BJ's correctly notes that improper proposals can "obscure other material matters in the proxy statements of issuers, thereby reducing the effectiveness of such documents."  Doc. No. 22 at 25 (quoting 41 Fed. Reg. at 52996).  But Rule 14a-8 already provides a safeguard against this concern by enumerating specific grounds for excluding improper proposals.  And, as explained above, the Fund is likely to succeed on its claim that the Proposal is not excludable under Rule 14a-8.  Thus, excluding the Proposal from BJ's proxy materials would harm, rather than serve, the public interest.

Because the four-factor test for preliminary injunction weighs in favor of the Fund, the Court ALLOWS the Fund's motion for injunctive relief and ENJOINS BJ's from excluding the Proposal from its 2026 proxy materials.

E.    Bond

One more issue requires comment.  Under Rule 65(c), a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  While Rule 65(c) sounds in mandatory terms, it is well-established in our Circuit that the "posting of a bond is not a jurisdictional prerequisite to the validity of a preliminary injunction."  Aoude v. Mobil Oil Corp., 862 F.2d 890, 896 (1st Cir. 1988).  Indeed, there is "ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond."  Int'l Assoc. of Machinists & Aerospace Workers v. E. Airlines, 925 F.2d 6, 9 (1st Cir. 1991).

BJ's argues that if the Court grants preliminary relief, the Fund should be required to post a security between $30,000 and $300,000.  BJ's derives this range from its estimation that adding "the Fund's Proposal to BJ's proxy statement before it is mailed on May 6, 2026 would likely cost BJ's approximately an additional $30,000" whereas "adding the Fund's Proposal to BJ's proxy statement after mailing would" cost "around $300,000."  Doc. No. 25 ¶¶ 8, 10.  Here, the upper bound of $300,000 is inapplicable because the Court is issuing the injunction before BJ's deadline to finalize and mail its proxy materials.  As for the lower bound, the Fund points out that the SEC estimates a different number from BJ's.  Pursuant to a 2020 rule, the SEC "use[s] the estimate of $18,982 to print and mail a single shareholder proposal, rounded up to $20,000, as the lower bound for [its] direct cost estimates in the economic analysis."  See Procedural

Requirements and Resubmission Thresholds Under Exchange Act Rule 14a-8, Exchange Act Release No. 34-8996485, Fed. Reg. 70240, 70274 (Nov. 4, 2020).  In light of these estimations, the Court ORDERS the Fund to post bond of $20,000 as security for any costs awarded pursuant to Rule 65(c).

III.    MOTION TO DISMISS

The Court turns briefly to BJ's motion to dismiss.  Doc. No. 16.  BJ's argues that the Fund's complaint fails to state a claim upon which relief can be granted for the same reasons asserted in its opposition to the motion for injunctive relief, namely: (1) the Fund has no private right of action to enforce Rule 14a-8; (2) the Proposal is excludable under the ordinary-business exclusion; (3) the Proposal is improper under Delaware Law; and (4) the Proposal is impermissibly vague.  The Court rejected each of these arguments above, applying a standard less favorable to the Fund in finding that it is likely to succeed on the merits of its claim.  On the more plaintiff-friendly standard governing a Rule 12(b)(6) motion, the Court necessarily finds that the Fund's complaint plausibly alleges its claim.  Therefore, BJ's motion to dismiss is DENIED.

IV.    CONCLUSION

For the foregoing reasons, the Fund's motion for injunctive relief, Doc. No. 5, is ALLOWED, and BJ's motion to dismiss, Doc. No. 16, is DENIED.  By May 6, 2026, the parties shall file a status report stating their joint or separate positions on how this case should proceed to final judgment.  Furthermore, the Fund shall post bond in the amount of $20,000 by May 1, 2026.

                                        SO ORDERED.


                                         /s/ Leo T. Sorokin
                                        United States District Judge

30